WELCH, Judge.
 

 Brandon McCombs was indicted on a charge of murder, a violation of § 13A-6-2, Ala.Code 1975. After hearing the evidence in the case, a jury convicted him of the lesser-included offense of manslaughter. The trial court then sentenced McCombs to 20 years’ imprisonment.
 

 The evidence adduced at trial tended to show the following. On the night of June 24, 2005, McCombs and two of his Mends went to a site on the Warrior River known as “the bridge,” where young adults primarily from the Pleasant Grove and Huey-town areas congregated. (R. 72.) McCombs, who had graduated from McA-dory High School in MeCalla a month earlier, had broken up with Brittney Vice, his girlfriend of several years, the day before.
 

 Several witnesses testified that there were several dozen people at the bridge when a pickup truck pulled up close to a gathering of people near a bonfire. There was conflicting evidence as to whether McCombs was driving the truck. McCombs got out of the truck and walked over to where Vice was talking to Matt Gibson, a boy she had known since elementary school. McCombs was not known to most of the people at the gathering.
 

 The witnesses testified that McCombs appeared to be angry. Gibson testified that McCombs was drinking beer from a bottle when he approached. McCombs told Gibson “to stop talking to his girlfriend, and that I needed to get away from her.” (R. 162.) Gibson said that he told McCombs that he was “just trying to calm [Vice] down.” (R. 162.) McCombs then stood a short distance away from Gibson, but Gibson said he could see McCombs was staring at him.
 

 Gibson’s older brother, Josh, was also at the bridge that night. Gibson testified that after McCombs and he had spoken, Josh went to McCombs and told him to leave Gibson alone. Josh’s friend Clay Burton also approached McCombs. Burton had his arm around McCombs’s shoulders to lead him away. Burton said he told McCombs that he was “outnumbered” and that it was possible he was going to “get [his] butt whooped.” (R. 372.) McCombs appeared to push Burton away, and Burton punched McCombs in the chest. Matt Farris then punched McCombs in the head, making him stumble. McCombs caught himself with his hand on the ground, straightened up, and another, unidentified, person hit him.
 

 After the third punch, McCombs began running toward the river. McCombs testified that he ran because he believed he “was going to get stomped,” as Burton had told him. (R. 576.) Witnesses said 20-year-old Tyler Vaughan, who was not involved in the altercation, “came up, placed his hands like on [McCombs’s] chest, like he was kind of breaking it up.” (R. 181-82.) Farris testified that Gibson then “took off and Tyler followed him.” (R. 182.) The two were headed down a hill toward the river, away from the fire and into the dark.
 

 Few people saw what happened next. Alan Hadder testified that as McCombs was running down the hill, he “bumped into Tyler. And it looked like he threw his hands up and hit Tyler in the chest and Tyler went and grabbed him. Like trying to slow him down to stop him. And then they went down the hill a little bit, and were kind of tied up.” (R. 215.) Hadder said it looked like Vaughan and McCombs were wrestling and McCombs hit Vaughan in the chest. “Right after that happened, Tyler just kind of let go, and was just kind of — seeing him grab his chest, and [McCombs] took off running into the woods.” (R. 216.)
 

 
 *952
 
 McCombs testified that he did not recall running into anyone as he ran away from the fire toward the woods and river. He said that he was scared and that he jumped into the river. He said he could hear people talking on the bank above him. He did not get out of the river “[bjecause I thought they would continue to beat me.” (R. 578.)
 

 Witnesses testified that after Vaughan and McCombs stopped wrestling and McCombs ran off, Vaughan said that he had been stabbed. Hadder called 9-1-1, and Vaughan’s friends helped him to the bed of a pickup truck. Vaughan was driven to a nearby service station, where paramedics met him. A helicopter was called to transport Vaughan from the service station to the hospital, where he died from a stab wound that had entered his heart.
 

 I.
 

 On appeal, McCombs contends, as he did in a timely motion for a new trial, that he received ineffective assistance of trial counsel because, the night before McCombs was to testify, his attorney instructed him to lie and to deny that he had stabbed Vaughan. In testifying as his attorney had advised, McCombs gave up the right to assert the defense of self-defense.
 

 At the hearing on his motion, filed by McCombs’s appellate attorney, McCombs’s trial counsel, Ralph L. “Buddy” Armstrong, admitted that the allegation was true. Armstrong testified that during the course of McCombs’s trial, he had become frustrated by what he characterized as witnesses who were testifying to information different from what they had said during the investigation of the case, to witnesses whose memories of the night of the incident were purportedly better 11 months after Vaughan’s death than in the days immediately following the incident, and to a police officer’s evasive answers to his questions on cross-examination. As a result of that frustration, he said, he instructed McCombs to lie and to state that he had not stabbed Vaughan rather than admit to the stabbing but evoking a defense of self-defense.
 

 Armstrong further testified that McCombs repeatedly asked him whether Armstrong was sure that he wanted McCombs to say that he had not stabbed Vaughan. Armstrong said that McCombs was young — 18 years old — and that Armstrong, a veteran criminal defense attorney, had an influence over McCombs such that McCombs was going to follow Armstrong’s advice in how to testify.
 

 Armstrong also said that in having McCombs testify falsely during the trial, he knew he was forgoing a defense of self-defense and that that was “a horrible mistake.” (Transcript on hearing on motion for new trial, R. 19.)
 

 McCombs testified that he was relying on the advice of his counsel when he testified falsely at the trial of this case.
 

 In
 
 Strickland v. Washington,
 
 466 U.S. 668, 686-87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court set forth the standard that must be met to find ineffective assistance of counsel. The Court explained that,
 

 “[i]n giving meaning to the [constitutional requirement of effective assistance of counsel] ... we must take its purpose— to ensure a fair trial — as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
 

 [[Image here]]
 

 “A convicted defendant’s claim that counsel’s assistance was so defective as to require a reversal of a conviction ... has two components. First, the defen
 
 *953
 
 dant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.”
 

 In remanding a case to the trial court for specific findings regarding a defendant’s claim of ineffective assistance of counsel, this court has held as follows:
 

 “ ‘The performance component outlined in
 
 Strickland,
 
 is an objective one: that is, whether counsel’s assistance, judged under “prevailing professional norms,” was “reasonable considering all the circumstances.” ’
 
 Daniels v. State,
 
 650 So.2d 544, 552 (Ala.Crim.App.1994) (quoting
 
 Strickland,
 
 466 U.S. at 688, 104 S.Ct. 2052). ‘A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.’
 
 Strickland,
 
 466 U.S. at 690, 104 S.Ct. 2052.”
 

 Thomas v. State,
 
 [Ms. CR-05-1553, September 28, 2007] - So.3d -, - (Ala.Crim.App.2007).
 

 The United States Supreme Court has stated that “under no circumstance may a lawyer either advocate or passively tolerate a client’s giving false testimony.”
 
 Nix v. Whiteside,
 
 475 U.S. 157, 171, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).
 
 [1]
 
 Rule 3.3(a)(3) of the Alabama Rules of Professional Conduct provides that a lawyer shall not knowingly offer evidence that he knows to be false. In discussing similar rules of professional conduct, the Supreme Court in
 
 Nix
 
 said,
 

 “These standards confirm that the legal profession has accepted that an attorney’s ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence. This special duty of an attorney to prevent and disclose frauds upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice.”
 

 Nix,
 
 475 U.S. at 168-69, 106 S.Ct. 988.
 

 There can be no question that the performance of McCombs’s trial counsel falls outside prevailing professional norms and was unreasonable under any circumstance. Therefore, we must determine whether Armstrong’s deficient performance so prejudiced McCombs as to deprive him of a fair trial.
 

 In suborning perjury, Armstrong prevented the jury from reaching a decision based on the actual facts of this case. McCombs argues that Armstrong’s deficient performance deprived him of the viable defense of self-defense. It is axiomatic that self-defense is a recognized defense to a charge of murder in Alabama. The defense has been codified at § 13A-3-23, Ala.Code 1975, in pertinent part, as follows:
 

 
 *954
 
 “(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose. A person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or defense of another person pursuant to subdivision (4), if the person reasonably believes that another person is:
 

 [[Image here]]
 

 “(3) Committing or about to commit ... assault in the first or second degree .... ”
 

 The evidence was undisputed that McCombs had been told that he was outnumbered and that it was possible he was going to get his “butt whooped.” McCombs had been hit by three people and, by all accounts, was attempting to run when Vaughan was killed. Based upon this evidence, a defense that McCombs acted out of a reasonable belief that an assault was imminent was a viable defense. Had the jury been allowed to consider that McCombs acted in self-defense, the verdict may have been different. Armstrong’s deficient conduct prejudiced McCombs’s opportunity for a fair trial and reliable verdict.
 

 We do not have an opinion as to what the “proper” verdict in this case should be — such a decision is to be left to the jury. See
 
 Brooks v. State,
 
 630 So.2d 160, 162 (Ala.Crim.App.1993) (whether a killing is justified under the theory of self-defense is for the jury to determine). However, self-defense was a plausible theory of defense under the evidence presented in this case. Because of the deficient performance of McCombs’s trial counsel, however, the jury was prevented from considering self defense. There clearly was a breakdown in the adversary process in this case that undermined the proceeding and administration of justice and rendered the resulting verdict unreliable. Thus, McCombs was denied his right to effective counsel.
 

 This court recognizes that McCombs committed perjury and that his attorney, Armstrong, suborned perjury in an attempt to manipulate the justice system. For a member of the bar to suborn perjury is anathema to the ideals and federal and state constitutions he has sworn to uphold. At the hearing on the motion for a new trial, the trial court expressed concerns about such manipulation. We agree with the trial court’s concerns, and we do not believe that the conduct of either Armstrong or McCombs should go unpunished. However, that punishment must be for them admitted subornation of perjury and perjury, respectively. McCombs still is entitled to a fair trial with a reliable verdict in this case.
 

 The issue before us is whether, in suborning perjury, McCombs’s trial counsel provided McCombs with ineffective assistance of counsel in McCombs’s trial for murder. For the reasons discussed above, we are compelled to find that he did. Therefore, we must reverse the judgment of the trial court, and we remand this cause for further proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 McMILLAN, J., concurs.
 

 BASCHAB, P.J., and SHAW, J., concur in the result.
 

 WISE, J., recuses herself.
 

 [1]
 

 . We note that the issue in
 
 Nix
 
 was whether a criminal defendant's Sixth Amendment right to assistance of counsel is violated when trial counsel
 
 refuses
 
 to cooperate with the defendant's decision to present perjured testimony during trial.