JOINER, Judge.
Nicholas Bernard Acklin, an inmate on death row at Holman Correctional Facility, appeals the Madison Circuit Court's denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R. Crim. P. We affirm.
On October 23, 1998, Acklin was convicted of one count of capital murder for killing Charles Lamar Hemphill, Michael A. Beaudette, Johnny Couch, and Brian Carter pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975, and two counts of attempted murder as to Ashley Rutherford and Michelle Hayden, see § 13A-6-2 and § 13A-4-2, Ala. Code 1975. The trial court sentenced Acklin to consecutive sentences of 20 years' imprisonment for his convictions for attempted murder. As to his conviction for capital murder, the jury recommended, by a vote of 10-2, that Acklin be sentenced to death; the trial court accepted that recommendation and sentenced Acklin to death.
In Acklin's direct appeal, we quoted the following relevant facts of the underlying crimes from the trial court's sentencing order:
" 'Late on the night of September 25, 1996, Nicholas Bernard Acklin and two companions, all heavily armed, entered the home of Ashley Rutherford on University Drive in Huntsville, Madison County, Alabama. Acklin, Joseph Wilson, and Corey Johnson held seven people at gunpoint in a 13' x 18' room and, for nearly two hours, assaulted, tortured, and humiliated them. Then, shortly before midnight, Acklin and Wilson fired 19 rounds of 9mm ammunition, shooting 6 of the 7 victims in or about the head. Four of the six victims died, two survived the shooting, and one victim escaped.
" 'The events giving rise to these slayings occurred approximately one week before the murders took place. At this time, Joseph ("Joey") Wilson and Corey *94 Johnson, while visiting the home of Ashley Rutherford, stole a cellular telephone and a small bag of marijuana. The theft of the cellular telephone prompted Rutherford and the owner of the phone, Lamar Hemphill, to file a police report with the Huntsville Police Department. As a result of the police report being filed, Wilson was questioned by the police regarding the theft of the phone. Once Wilson learned that a police report had been filed, he became angry. On the night of September 25, 1996, Wilson, Acklin, and Johnson went to Ashley Rutherford's home seeking revenge against those persons they deemed responsible for filing the report.
" 'Early in the evening of September 25, 1996, Ashley Rutherford's fiancee (Michelle Hayden) and two of his friends (Brian Carter and Lamar Hemphill) sat in Rutherford's garage apartment watching television and awaiting Rutherford's return from work. Later, Michael Beaudette, another friend of Ashley Rutherford, arrived and joined Hayden, Carter, and Hemphill in watching television and socializing. At approximately 10:00 p.m., Mike Skirchak and Johnny Couch, while driving past Rutherford's home on University Drive, noticed Michael Beaudette's car and decided to stop and talk for awhile with Beaudette and the others. At approximately 10:05 p.m., Skirchak and Couch decided to leave. As the two young men exited Rutherford's home, they were met by Nicholas Acklin, Joey Wilson, and Corey Johnson, who forced them back inside the garage apartment.
" 'Once inside the apartment, Acklin, Wilson, and Johnson began asking repeatedly, "Who filled out the warrant?" When no one would give them a satisfactory answer, they brandished handguns and began physically assaulting Skirchak, Couch, Beaudette, Carter, and Hemphill. Specifically, these five young men were kicked, slapped, punched, spat on, and beaten with a whiskey bottle by Wilson and Johnson. A few times during these assaults, Acklin took Michelle Hayden outside and made sexual advances towards her. Acklin fondled Hayden's breasts and repeatedly asked her to pull down her pants. After approximately an hour of the aforementioned behavior, Ashley Rutherford arrived home from work and he was immediately confronted by Johnson, who forced him into the apartment. Once inside, Rutherford was also interrogated about the police report. He, too, was beaten and threatened. In fact, as the night progressed, two of the three assailants, Nicholas Acklin and Joey Wilson, grew increasingly violent and more demeaning. For example, Acklin placed a .357 magnum revolver in Rutherford's mouth and shoved it into his throat until Rutherford gagged. Acklin also placed Michael Beaudette in a headlock and placed the same .357 magnum revolver under his chin. Wilson kicked and stomped Johnny Couch until he was almost unconscious and then cut his ponytail off with a pair of scissors. A short while after this incident, Acklin made Michelle Hayden accompany him outside while he stole Brian Carter's car stereo from Carter's car. When Acklin returned to the overcrowded apartment, he threw a pocket-knife at Brian Carter's feet. Then, Acklin turned to Wilson, who was holding a Ruger 9mm semi-automatic handgun and proclaimed, "Look, he has a knife!" Both Acklin and Wilson continued humiliating the victims by making them do self-degrading things, such as take off their pants and sit exposed in their underwear. At one point in the evening, Wilson placed his handgun on a dresser and dared anyone *95 to try and grab it. Furthermore, following one of the several occasions that Acklin took Michelle Hayden outside, Acklin went back inside the apartment and told her fiance, Ashley Rutherford, that his girlfriend had just performed oral sex on him.
" 'As the night progressed, all seven victims asserted that they did not know anything about a warrant being filed against Wilson. However, Rutherford and Hemphill did admit to their attackers that a police report had been filed for the stolen cellular phone, but no one had sworn out a warrant. Despite the assertions by Rutherford and Hemphill, as well as from the others, the anger of both Acklin and Wilson rose to a dangerous crescendo. Just before midnight, Acklin and Wilson made all seven victims give them their driver's licenses and identification cards. At this point, Corey Johnson tried to calm Acklin and Wilson down by telling them that the victims were not going to talk and that they didn't have to shoot anyone. Unfortunately, Acklin and Wilson ignored Johnson and began shouting for someone to go and start the car. After yelling back and forth to each other to go start the car, Acklin finally left Wilson inside and went to start Wilson's car. At this point, Wilson was holding the seven victims at gunpoint and demanding that someone tell him who filed what he claimed was a warrant against him. When Acklin returned from outside, he was holding one of the two Lorcin 9mm handguns that had been tucked in his waistband earlier that night. As Wilson continued to demand answers to his questions, Acklin proclaimed, "Fuck it," and placed the Lorcin 9mm against the back of Ashley Rutherford's head and fired. Then, in a methodical manner, as each of the other victims sat and watched, Acklin shot Lamar Hemphill once in the head, shot Johnny Couch twice in the head, shot Michael Beaudette once in the head and once in the upper leg, and shot Michelle Hayden in the side of her face, in her arm, and in her abdomen.... Joey Wilson shot Brian Carter six times in the neck and chest.... Mike Skirchak ran out of the back door of the apartment without any gunshot wounds.
" 'After having fired 19 rounds of ammunition inside the apartment, Acklin, Wilson, and Johnson fled. Ashley Rutherford, the first person shot by Acklin, laid in a pool of his own blood and pretended to be dead until he was sure that his attackers had left the apartment. Once he knew that they were gone, Rutherford left the garage apartment and went into the main part of the house to get help from his grandmother. After he told his grandmother to call an ambulance, Rutherford went back to assist his fiancee Hayden, who was lying in the doorway leading to the main part of the house. At approximately 12:30 a.m., Madison County emergency medical technicians arrived on the scene and determined that Michael Beaudette, Brian Carter, and Johnny Couch were already dead. Michelle Hayden was alive, but critically wounded, and Lamar Hemphill died minutes after medical technicians arrived.' "
Acklin v. State, 790 So.2d 975, 982-84 (Ala. Crim. App. 2000) (quoting Trial C. 280-84[1] ).
*96 In relevant part, the trial court found that two aggravating circumstances existed: (1) the defendant knowingly created a great risk of death to many persons and (2) the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. See § 13A-5-49, Ala. Code 1975. With regard to the second aggravating circumstance, the sentencing order states, in relevant part:
"Prior to the discharge of the two weapons, the victims were subjected to threats and intimidation. The victims were restrained at gunpoint and required to remove various portions of their clothing (primarily their pants). Joey Wilson kicked and stomped Johnny Couch until he was almost unconscious, and to further degrade and disfigure him, he cut off his pony tail with a pair of scissors.[4] Throughout the evening Skirchak (the victim who escaped), Couch, Beaudette, Carter and Hemphill were repeatedly kicked, slapped, punched, spat on, and beaten with a whiskey bottle by Wilson and Johnson. After his arrival, Ashley Rutherford was also beaten and threatened.
"Several times during the night, Acklin took Michelle Hayden outside and made sexual advances toward her. Acklin fondled Hayden's breasts and repeatedly asked her to pull down her pants. After Acklin brought Michelle back inside, he told Ashley Rutherford that his girlfriend had performed oral sex on him. (She did not.)
"Acklin later placed a .357 magnum revolver in Rutherford's mouth and shoved it into his throat until Rutherford gagged. Acklin also placed Michael Beaudette in a headlock and placed the same .357 magnum revolver under his chin.
"The perpetrators also stole various items from the victims. They took the victims' driver's licenses (Beaudette's driver's license was recovered in the pair of pants that Acklin was wearing when they were seized by law enforcement). On one occasion Acklin made Michelle Hayden accompany him outside, while he stole Brian Carter's car stereo from Carter's car.
"This was an execution-style slaying. Acklin and Wilson killed or attempted to kill all of the victims in order to avoid later identification. In Bush v. State, 431 So.2d 555, 560-561 (Ala. Crim. App. 1982), aff'd 431 So.2d 563 [ (Ala. 1983) ], cert. denied, 464 U.S. 865 (1983), the Court of Criminal Appeals stated: 'Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel'
"In Lawhorn v. State, 581 So.2d 1159, 1175 n.7 (Ala. Crim. App. 1990), aff'd, 581 So.2d 1179 (Ala. 1991), the Court ruled that 'Evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of [the] aggravating circumstance[ ] that the murder was heinous, atrocious, and cruel.' It is almost impossible to contemplate the fear and indeed the stark terror experienced by all of these victims on the night of September 25, 1996. After being repeatedly threatened, taunted, beaten and (in Hayden's case) sexually assaulted, Acklin and Wilson began shouting for someone to go and start the car. It was at this point that the four deceased victims certainly realized what was about to happen. Certainly, everyone there knew that they were about to die. Finally, each of the victims watched their friends being methodically shot before it was their time to die.
"The actions of the defendant were conscienceless and pitiless. This was not *97 just a murder, it was a massacre in which the defendant engaged in a bloody orgy of death and destruction. By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil. While the Court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, the degree of heinousness, atrociousness and cruelty which characterizes this offense exceeds that which is common to all capital offenses.
"_______________
"[4] While some of the actions cited herein were performed by Joey Wilson[2 ] and Corey Johnson, the defendant is equally liable for the conduct of Johnson and Wilson due to complicity. Alabama Code [1975,] § 13A-2-23. Within that statute, the terms 'aid and abet comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.' Turner v. State, 674 So.2d 1371, 1376 (Ala. Crim. App. 1995). The Court therefore finds that the defendant was equally responsible for the beatings, tauntings and other abuse heaped upon the victims by Wilson and Johnson."
(Trial C. 288-90.)
The trial court found that one statutory mitigating circumstance existed: Acklin had no significant history of prior criminal activity. See § 13A-5-51, Ala. Code 1975. As to nonstatutory mitigating circumstances, the trial court stated, in relevant part:
"The defendant proffered a number of witnesses during the second and third stage sentencing hearings. Among those to testify were his mother, father, grandmother, and several other individuals who had known Acklin during his youth.
"The following nonstatutory mitigating circumstances were either asserted by the defense or were gleaned by the Court from the testimony proffered by the defendant and the pre-sentence report.
"Prior to September 25, 1996, the defendant was a quiet and polite individual who had no history of assaultive behavior.
"All the evidence indicates that, during his formative years, Acklin was a quiet, polite and non-violent young man. The Court finds this mitigating circumstance has been proven and will be given appropriate weight.
"The defendant has a common-law wife and two children.
"While never formally married, the defendant has fathered two children .... [One of those children and her mother, Candice Wilson,] were living with the defendant at the time of his arrest. Counsel for the defendant contends that Nicholas Acklin and Candice Wilson are married at 'common-law.' This Court finds that this mitigating circumstance has been proven and will give it appropriate weight.
"The defendant attended church and participated in church activities when he was younger.
"Several witnesses testified that Acklin had participated in church activities when he was younger. The Court finds that this mitigating circumstance has been proven and will give it appropriate weight.
"The defendant was raised in a good home by loving parents.
*98 "The Court was impressed with the sincerity of the testimony by the defendant's mother and father. They are clearly good people and tried to do the right thing in raising him. However, the Court does not find this to be a mitigating circumstance. Most killers are typically the products of poverty, a dysfunctional family, physical or sexual abuse and/or social deprivation. Acklin was the product of a loving middle-class family. Acklin was exposed to all of the values that are central to an ordered society; however, he chose to reject them. Acklin made a conscious choice to become a killer; he was not born to it.
"The defendant's father says that he is remorseful.
"The defendant's father testified that Acklin was remorseful. While the Court finds that the testimony on this point by the defendant's father is not contradicted, the Court is not convinced that the defendant is remorseful. The defendant did not apologize to the victims' families, either in the second stage or third stage sentencing hearing. He never uttered a word of remorse. Acklin even had a half-smile or smirk on his face when the Court was sentencing him to death. The defendant glared at each of the witnesses with a gaze that was devoid of emotion. The defendant is clearly not remorseful. The Court finds that this statutory mitigating circumstance is not applicable."
(Trial C. 292-94.)
In weighing the aggravating and mitigating circumstances, the trial court stated:
"In summary, this Court has found that two aggravating circumstances were established by the evidence beyond a reasonable doubt. The Court has also considered the advisory verdict of the jury recommending death. Those have been compared to and weighed against one statutory mitigating circumstance and several nonstatutory mitigating circumstances. After careful and deliberate consideration, this Court is convinced beyond a reasonable doubt that the two aggravating circumstances substantially outweigh the one statutory and several nonstatutory mitigating circumstances. While the Court is not required by law to make this second analysis, the Court nevertheless finds that each of the two aggravating circumstances, even standing alone, outweigh all the mitigating circumstances.
"The savage brutality of these murders is shocking. As was stated supra, the defendant's actions led to a massacre. The United States Supreme Court has recognized that 'certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' Gregg v. Georgia, 428 U.S. 153, 184 (1976). This is such a crime.
"Robert Oppenheimer is considered by most historians and scientists to be the 'father' of the atomic bomb. When the atomic bomb was first tested in New Mexico in 1945, Oppenheimer was awestruck at the bomb's destructive power. In considering the destruction that the atomic bomb would soon bring to Japan, Oppenheimer paraphrased an ancient Hindu religious scholar and said, 'I fear I am become death, the destroyer of worlds.'
"In this case, Nicholas Acklin chose to 'become death, the destroyer of worlds.' He destroyed the world of three young men and their families by his own hand and destroyed the world of one other young man through the hands of his accomplice. He also tried mightily to destroy the world of another young man *99 and a young lady. Because he has chosen to 'become death' and destroy so many worlds, it is to death he shall return."
(Trial C. 294-96.)
On appeal, this Court affirmed Acklin's convictions and sentences, including his death sentence. Acklin v. State, 790 So.2d 975 (Ala. Crim. App. 2000). The Alabama Supreme Court denied Acklin's petition for a writ of certiorari, Ex parte Acklin 790 So.2d 1012 (Ala. 2001), as did the United States Supreme Court, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001). The certificate of judgment, making Acklin's direct appeal final, was issued on January 12, 2001.
On June 18, 2002, Acklin filed the underlying Rule 32 petition. Over the next 11 years, Acklin filed three amended petitions and, among other things, numerous requests for discovery. The matter was assigned to several circuit judges over the years.[3] Several of the Rule 32 claims were summarily dismissed. The circuit court held an evidentiary hearing on the remaining claims in December 2013.
On April 8, 2015, in a detailed 45-page order, the circuit court denied the Rule 32 petition. Acklin appealed to this Court. See Rule 32.10, Ala. R. Crim. P.
Standard of Review
" '[Acklin] has the burden of pleading and proving his claims. As Rule 32.3, Ala. R. Crim. P., provides:
" ' "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."
" ' "The standard of review this Court uses in evaluating the rulings made by the trial court [in a postconviction proceeding] is whether the trial court abused its discretion." Hunt v. State, 940 So.2d 1041, 1049 (Ala. Crim. App. 2005). However, "when the facts are undisputed and an appellate court is presented with pure questions of law, [our] review in a Rule 32 proceeding is de novo." Ex parte White, 792 So.2d 1097, 1098 (Ala. 2001). "[W]e may affirm a circuit court's ruling on a postconviction petition if it is correct for any reason." Smith v. State, [122] So.3d [224], [227] (Ala. Crim. App. 2011).
" '....As stated above, [some] of the claims raised by [Acklin] were summarily dismissed ....
" '....'
" Washington v. State, 95 So.3d 26, 38-39 (Ala. Crim. App. 2012).
"[Acklin's] remaining claims were denied by the circuit court after [Acklin] was afforded the opportunity to prove those claims at an evidentiary hearing. See Rule 32.9(a), Ala. R. Crim. P.
"When the circuit court conducts an evidentiary hearing, '[t]he burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State.'
*100 Davis v. State, 9 So.3d 514, 519 (Ala. Crim. App. 2006), rev'd on other grounds, 9 So.3d 537 (Ala. 2007). '[I]n a Rule 32, Ala. R. Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence.' Wilson v. State, 644 So.2d 1326, 1328 (Ala. Crim. App. 1994). Rule 32.3, Ala. R. Crim. P., specifically provides that '[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.' '[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo.' Ex parte White, 792 So.2d 1097, 1098 (Ala. 2001). 'However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, "[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition." ' Boyd v. State, 913 So.2d 1113, 1122 (Ala. Crim. App. 2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala. Crim. App. 1992) ).
"Finally, '[a]lthough on direct appeal we reviewed [Acklin's] capital-murder conviction for plain error, the plain-error standard of review does not apply when an appellate court is reviewing the denial of a postconviction petition attacking a death sentence.' James v. State, 61 So.3d 357, 362 (Ala. Crim. App. 2010) (citing Ex parte Dobyne, 805 So.2d 763 (Ala. 2001) ). With these principles in mind, we review the claims raised by [Acklin] on appeal."
Marshall v. State, 182 So.3d 573, 580-82 (Ala. Crim. App. 2014) (some citations omitted).
Discussion
On appeal, Acklin raises four issues-each of which relates solely to claims presented at the December 2013 evidentiary hearing. Acklin does not address any claims that were summarily dismissed, nor does he raise all the claims that were designated for the evidentiary hearing. Accordingly, we address only those issues Acklin raises on appeal.[4]
I.
Acklin's primary claim is that his trial counsel were ineffective due to an alleged financial conflict of interest. (Acklin's brief, p. 13.) To examine this claim, a brief background is necessary.
Acklin was represented at his trial by Behrouz Rahmati and Kevin Gray.[5] The evidence at the Rule 32 hearing indicated that Rahmati agreed to represent Acklin after he met with Acklin's mother, Velma Acklin Evans ("Velma"), and Acklin's father, Theodis Acklin ("Theodis"), in September 1996, a few days after the offenses occurred. Velma signed an agreement with Rahmati providing for a $25,000 retainer and an hourly rate of $150 per hour. At that time, Rahmati and Gray were not partners, but Gray eventually began assisting Rahmati on the case.
At the time Rahmati was retained, he knew that Velma and Theodis were divorced. Regarding his $25,000 retainer and Velma's ability to pay him, Rahmati testified that it was "obvious from Day 1" that Velma was in "financial distress" and Rahmati *101 "suspected strongly [that he and Gray] were never going to get paid." (R. 56.)
During Rahmati's testimony, Acklin introduced billing statements and "monthly billing" letters from Rahmati's law firm.[6] That evidence, along with Rahmati's testimony, indicated that Velma paid several monthly payments of around $100 toward the retainer, for a total of about $1,900. Regarding these monthly payments, Rahmati testified that in his experience, when a parent of a client makes monthly payments of $100 to $200, "that's a very strong signal they can't afford paying." (R. 56.)
The evidence also indicated that by the time of Acklin's October 1998 trial, Theodis had made three sporadic payments totaling $2,900. (R. 80.) Those three payments of $700, $2,000, and $200 occurred in March 1998, September 1998, and October 1998, respectively. Rahmati testified that he did not know what convinced Theodis to pay toward the retainer, but he said that based on his interactions with Theodis, Velma, and Acklin, he did not think Theodis was "really trying as hard" as Velma to help with Acklin's case.
The record indicates that, based on billing statements, trial counsel spent more than 400 hours preparing for Acklin's trial. On June 1, 1998, Rahmati submitted a letter to the trial judge, along with an affidavit indicating that Acklin was indigent, in which Rahmati sought to be appointed as counsel. A few days later, Rahmati withdrew the request, in part because Gray, who had not been practicing law for five years, could not have been appointed to assist with Acklin's defense. Rahmati testified that, at the time, Alabama law imposed a statutory cap on the amount of money an appointed attorney could be paid in a capital case. Rahmati also testified:
"A. I consciously decided to withdraw my request for appointment for various reasons.
"Q. But on that June 1st, 1998 request to be appointed, you weren't seeking to have all counsel removed entirely, new counsel to be appointed to Mr. Acklin, right?
"A. No. It would have been a situation of me staying in as counsel and asking the Court to appoint a co-counsel of my choosing. Thank God, Judge Smith was kind enough, if I recall-if I recall, I think he would have appointed whoever I asked to be appointed. But then I withdrew my request to be appointed because, truly, I would have rather have Kevin Gray to stay as my co-counsel because of-I just knew how much he was putting into the case.
"And furthermore, [Acklin] himself specifically requested that Kevin and I stay in the case, and I want to say perhaps his mom did as well, but I can't remember. I can't remember about his father. You have to understand, sir, at that point it wasn't necessarily about the money anymore."
(R. 72.)
In preparing for Acklin's trial, both Rahmati and Gray testified that they felt relatively certain they would need to be prepared for a penalty phase, and they began preparing for that phase in advance of the trial. Trial counsel were in consistent contact with Acklin and his family, and they interviewed several potential character witnesses, many of whom testified during the penalty phase.
The record indicates that trial counsel knew Acklin allegedly had used alcohol *102 and marijuana at the time of the crimes. Counsel consulted experts about the possible effects those substances could have had on Acklin, particularly because he was a diabetic. Counsel also examined a report of a forensic psychological evaluation performed on Acklin. Ultimately, however, counsel determined that, in their opinion, none of the information from the experts or the evaluation would have been beneficial to Acklin in either the guilt phase or the penalty phase.
Counsel also testified that they asked Acklin and his parents about Acklin's childhood but that they were not told anything remarkable or out of the ordinary. On October 17, 1998-two days before Acklin's trial was to begin-Velma met alone with Rahmati, however, and told Rahmati that Theodis had perpetrated severe abuse against her and their children, including Acklin. This abuse, according to Velma's testimony at the evidentiary hearing, became very intense when Velma told Theodis she had had an affair. In 1982, within a year of the disclosure of the affair, Velma and Theodis were divorced, and Theodis was given full custody of the couple's three sons.[7]
At the evidentiary hearing, Velma and her son Steve Acklin testified about the abuse. The abuse included multiple allegations of Theodis threatening Velma and the children with a gun. Velma testified that Theodis "would have a gun in his hand, and he would be shaking it, and he would just shove it down [her] mouth." (R. 219.) Acklin and his brothers "would be screaming, telling their dad not to hurt their mom." (R. 220.) Velma also testified that she once fell from a second-floor window during a fight with Theodis over a rifle, which resulted in her being hospitalized. (R. 225-29.)
Rahmati testified that, when he first learned of the abuse two days before Acklin's trial, he "was very surprised that they never disclosed those details to us, even though we had discussed, with the whole family that we could talk to, with the exception of the brothers [who, Rahmati thought, were incarcerated]." Once he learned of the abuse, Rahmati talked to Theodis. Rahmati testified:
"Q. What did you say to [Theodis] after Velma told you about the abuse?
"A. I told [Theodis] that I had learned about the-or that [Velma] had told us about the physical and the mental abuse, more or less at his hands to paraphrase, that he had put [Acklin] through and [Velma] through and the brothers through. And obviously, at that point, you know, I had a different opinion and vision of [Theodis].
"....
"... [And] I asked him if he would consider testifying regarding that so we could at least-you know, first I wanted to see if he was willing to talk to me about it to see if, in fact, it was true, (one); (two), if it was true, what his reasons were as to why he may have been like this towards his kids or towards his wife.
"Q. Right. Then if he had told you that information, would you have then talked to him about possibly getting on the stand at the trial and relating this?
*103 "A. Sure. Yes, that's what I did, and he wasn't happy about that idea.
"Q. What do you mean, 'He wasn't happy'?
"A. He wasn't happy. He didn't appreciate the idea that his ex-spouse, [Velma], had disclosed these facts to me. I can't remember what he specifically said. It was as if, 'It's all not true.' I told him, 'Look, this is critical. You can help your son possibly, possibly. We've got a stacked deck against us as it is.'
"In my opinion, if the father truly-even if the father was abusive, if he truly loved his son, he would appear in court, if needed, to help. He took a very aggressive posture with me.
"Q. What does that mean?
"A. He wasn't happy. As I recall, we were in [the] office, and I can't remember if [Velma] was there or not. He literally got up as he started hearing what I was saying about what [Velma] had said. He literally stood up, and he was like, 'I can't believe they are doing this,' or 'They are going there,' something to that effect. Visibly, he was angry, and he said, 'You tell [Acklin] if he wants to go down this road, I'm done with him,' to that extent.
"Q. 'I'm done with him'?
"A. More or less. If I recall, that was the verbiage he used. He got up and walked out of my office. And if I recall, as he was walking out, I told him, '[Theodis], I will do whatever I need to, to get you to this sentencing phase; I just want you to know that,' and I don't think he even said anything. I was talking to the back of his head as he was walking out. He left, and that was it."
(R. 110-12.)
As to whether Rahmati considered putting this evidence on during the penalty phase, Rahmati said that he did.[8] Rahmati testified that he believed that the allegations were true and that, when he went to talk to Acklin the next day, Acklin confirmed that they were true. Rahmati's testimony on his interaction with Acklin was as follows:
"Q. You said ... that you got confirmation from Nick Acklin about what Velma said, right?
"A. Yes, sir.
"Q. You honestly told Nick everything that happened with Velma, right?
"A. Yes, sir.
"Q. You were open with him?
"A. Sure.
"Q. Told him everything-
"A. Yes.
"Q. -as to Velma?
"A. As to what his mother told me, yes, and about discussions with his father as well.
"Q. So discussions with the father; you told him everything that the father said? ... The father getting up and leaving your office? ... And what the father told you?
"A. Yes, sir."
(R. 131-32.) According to Rahmati's records, he consulted with Acklin for two hours at this time. Counsel Gray also met with Acklin the same day.
Rahmati explained to Acklin that Velma, Theodis, and Acklin's brothers could be called to testify about the abuse and that *104 the jury could consider that testimony as mitigating. Acklin, however, steadfastly refused to permit Rahmati to introduce the evidence. Rahmati testified:
"A.... [Acklin] admitted that the physical and mental abuse took place, but he specifically stated he did not want me to introduce that evidence into the case because he didn't want to put his father in that position, or to really put his family in that position. I urged him that this was important. How much impact would it have, if any, I wasn't sure, but I felt certainly that we would need to try to introduce it. He didn't want to-if I recall, he said they didn't-if I recall, [Acklin] said something to the effect of, 'That didn't cause me to be here. I don't want to ruin their lives or have anything like this to come out on them.' So he specifically required us not to-instructed us not to subpoena his father or introduce this evidence.
"Q. As a result of what your client told you, did you ask him to memorialize his instructions in any specific way?
"A. Yes, sir. Because we felt so strong about the need to try to introduce this evidence and the fact that he had instructed us not to, I felt the need to memorialize it in the form of a writing that we asked [Acklin] to sign, which he signed, just for me to have in my file.
"....
"Q. Did you threaten [Acklin] in any way in order to get him to sign this particular document?
"A. Absolutely not.
"Q. Now, if you could, please read the last sentence beginning, 'I have expressly.'
"A. 'I have expressly forbidden them to mention or present such evidence or argue such evidence during any part of the trial proceeding, including either the guilt or the penalty phase.'
"Q. When he refers to 'such evidence,' what is the particular evidence you understood he was forbidding you and Mr. Gray from presenting either at the guilt phase or the penalty phase?
"A. It was primarily the physical and the verbal abuse that [Velma] told us that [Theodis] carried out on the family, including, I think, the reference to the gun, pointing the gun at the kids, telling them he was going to kill them, things like that."
(R. 164-66.)
The statement signed by Acklin provided in full:
"I, Nicholas Bernard Acklin, hereby acknowledge that my attorneys, Behrouz K. Rahmati and Kevin C. Gray, have consulted with me and advised me regarding certain potentially mitigating evidence, which they are prepared to offer on my behalf. This mitigating evidence consists of testimony from my mother and possibly other siblings and family members that I suffered some degree of abusive behavior during my formative years at the hands of my father. Such behavior included, but was not limited to, my father pointing guns at me. My above-mentioned attorneys have advised me that this evidence could possibly be considered by a jury in mitigation of any aggravating circumstances argued by the State at my trial. However, I have advised my attorneys that I do not desire them to put such evidence before the Court or the jury. I have expressly forbidden them to mention or present such evidence or argue such evidence during any part of the trial proceeding, including either the guilt or penalty phase."
(C. 4978.)
Although he was subpoenaed to testify at the hearing, Theodis did not testify. Acklin also did not testify at the hearing.
*105 Acklin raises a number of claims related to this waiver and the decision of his trial counsel not to put on evidence of the alleged abuse.
A.
First, Acklin argues that he "was denied his right to conflict-free counsel because his attorney (A) had divided loyalties due to the third-party payer arrangement, and (B) chose a course of action that helped the person paying him and harmed his client." (Acklin's brief, p. 13.)
As to a claim alleging ineffective assistance of counsel, this Court stated in Marshall, supra :
" 'To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668 (1984).
" ' "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
" ' Strickland, 466 U.S. at 689.
" ' "[T]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington ], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ] ; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that '[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)."
" ' Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir. 2000) (footnotes omitted).
*106 " 'An appellant is not entitled to "perfect representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). "[I]n considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.' " Burger v. Kemp, 483 U.S. 776, 794 (1987).' "
Marshall, 182 So.3d at 582 (quoting Yeomans v. State, 195 So.3d 1018, 1025-26 (Ala. Crim. App. 2013) ). Furthermore,
" ' "[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." ' Ray v. State, 80 So.3d 965, 977 n.2 (Ala. Crim. App. 2011) (quoting Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) ).
"We also recognize that when reviewing claims of ineffective assistance of counsel 'the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.' Strickland v. Washington, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."
Marshall, 182 So.3d at 582-83.
"Addressing a lawyer's conflict of interest as it relates to the Sixth Amendment right to effective counsel, this Court has explained:
" ' " ' "[I]n order to establish a violation of the Sixth Amendment, ... [a defendant] must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. [335] at 348, 100 S.Ct. [1708] at 1718 [ (1980) ]. Accord Williams v. State, 574 So.2d 876, 878 (Ala. Cr. App. 1990). To prove that an actual conflict adversely affected his counsel's performance, a defendant must make a factual showing "that his counsel actively represented conflicting interests," Cuyler v. Sullivan, 446 U.S. at 350, 100 S.Ct. at 1719, " 'and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." ' " Barham v. United States, 724 F.2d 1529, 1532 (11th Cir.) (quoting United States v. Mers, 701 F.2d 1321, 1328 (11th Cir. 1983) ), cert. denied, 467 U.S. 1230, 104 S. Ct. 2687, 81 L.Ed.2d 882 (1984). Once a defendant makes a sufficient showing of an actual conflict that adversely affected counsel's performance, prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) -i.e., "that, but for counsel's unprofessional errors, the result of the proceeding would have been different"-is presumed. Strickland, 466 U.S. at 694, 692, 104 S.Ct. at 2068, 2067. See United States v. Winkle, 722 F.2d 605, 610 (10th Cir. 1983) ; Williams v. State, 574 So.2d at 878.' " '
" Jones v. State, 937 So.2d 96, 99-100 (Ala. Crim. App. 2005) (quoting Wynn v. State, 804 So.2d 1122, 1132 (Ala. Crim. App. 2000) ). Additionally,
" ' "[a]n actual conflict of interest occurs when a defense attorney places himself in a situation 'inherently conducive to divided loyalties.' Castillo [v. Estelle], 504 F.2d [1243] at 1245 [ (5th Cir. 1974) ]. If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some *107 action that could be detrimental to his other client."
" ' Zuck v. Alabama, 588 F.2d 436, 439 (5th Cir. 1979).' "
Ervin v. State, 184 So.3d 1073, 1080-81 (Ala. Crim. App. 2015). See also Smith v. State, 745 So.2d 922, 938 (Ala. Crim. App. 1999).
Acklin argues that Rahmati "had an actual conflict of interest because his loyalties were divided between his client and the person paying his fee." (Acklin's brief, p. 14.) In rejecting this conflict-of-interest claim, the circuit court stated:
"This Court finds that the testimony of Mr. Rahmati and Mr. Gray, which was corroborated by their billing statement, proves that they were very diligent in preparing for Acklin's trial. The billing statement documents that Mr. Rahmati and Mr. Gray spent over 400 hours preparing for Acklin's trial. Mr. Rahmati also testified that not all of the time he and Mr. Gray spent preparing for trial was reflected in the billing statement.
"....
"Acklin claimed that his trial counsel suffered a conflict of interest because his parents were unable to pay the $25,000 retainer fee. In particular, Acklin claimed his parents' inability to pay created a conflict of interest because 'any work performed on [Acklin's] case would reduce the amount of work counsel could do on a case which would actually generate income.'
"Mr. Rahmati acknowledged that he and Mr. Gray lost money by representing Acklin. However, the testimony of Mr. Rahmati and Mr. Gray, together with their billing statement, convinces this Court beyond any reasonable doubt that a lack of payment did not curtail their efforts to defend Acklin. Trial counsel's billing statement indicates they spent more than 400 hours preparing for Acklin's trial. Trial counsel thoroughly investigated for the guilt phase and penalty phase of trial, including whether Acklin was intoxicated the night of the murders.
"... The Court finds that Acklin failed to prove that his parents' failure to pay the entire retainer fee caused [trial counsel] to suffer a conflict of interest.... The Court finds that no prejudice was suffered by Acklin....
"....
"Acklin also claims that a conflict of interest arose when his father threatened to stop making further payments to Mr. Rahmati and Mr. Gray if they presented evidence during the penalty phase of trial that Acklin's father was physically and emotionally abusive toward him and his family.
"Acklin's trial counsel questioned Acklin and his mother about his background, including whether Acklin had suffered any type of abuse. Initially, neither Acklin nor his mother disclosed that Acklin's father was verbally and physically abusive to Acklin and other family members. It was not until mere days before Acklin's trial that his mother disclosed to Mr. Rahmati that Acklin's father was physically and emotionally abusive. Acklin confirmed his mother's belated disclosure about his father's abusive behavior only when he was confronted by trial counsel. When Acklin was informed by his trial counsel that evidence he was abused by [his] father could be presented as a mitigating circumstance during the penalty phase, Acklin prevented them from presenting it.
"In Adkins v. State, 930 So.2d 524, 540 (Ala. Crim. App. 200[1] ), the Alabama Court of Criminal Appeals held that '[u]ltimately the decision to waive the presentation of mitigating evidence was *108 Adkins' decision. We refuse to find an attorney's performance ineffective for following his client's wishes.' See Schriro v. Landrigan, 550 U.S. 465, 476-477 (2007) (holding that trial counsel was not ineffective during the penalty phase for failing to present certain potentially mitigating evidence where the defendant prohibited counsel from presenting said evidence).
"Mr. Rahmati testified that when he confronted [Theodis] about domestic abuse and informed [him] it could be presented at the penalty phase that he 'wasn't happy.' According to Mr. Rahmati, Acklin's father told him that '[y]ou tell Nick if he wants to go down this road, I'm done with him' and left Mr. Rahmati's office. Acklin presented no evidence that his father threatened to not pay trial counsel if they presented evidence that he was abusive during the penalty phase. From the time Mr. Rahmati agreed to represent Acklin he knew it was unlikely [Velma] could pay the retainer fee. At the evidentiary hearing, Mr. Rahmati stated that 'I suspected strongly we were never going to get paid from Day 1.' This Court finds that Mr. Rahmati's and Mr. Gray's failure to present potential mitigating evidence regarding domestic abuse to the jury and trial judge was not because of a conflict of interest with Acklin's father-it was because Acklin made the conscious decision that he did not want this evidence presented at trial."
(C. 4004-08.) Acklin has not demonstrated that these findings by the circuit court are erroneous.
Acklin argues that Theodis's comment he was "done helping with this case" necessarily meant that Theodis would have stopped paying trial counsel. Even if that is true, however, the evidence supports the circuit court's findings (1) that Rahmati and Gray did not expect to be paid the full retainer and (2) that the failure of the parents to pay the full retainer did not prejudice Acklin, particularly in light of the work Rahmati and Gray did on the case.[9]
Furthermore, Rahmati's testimony that he told Theodis that he would "do whatever [he] need[ed] to, to get [Theodis] to this sentencing phase" was uncontradicted (R. 112), as was Rahmati's testimony that he told Acklin everything about his interaction with Theodis including that Theodis could be required to testify. In short, Acklin failed to prove that an actual conflict existed or that Rahmati had "divided loyalties" between Acklin and Theodis. The evidence supports the circuit court's finding that the sole reason for trial counsel's failure to introduce evidence of the alleged abuse was that Acklin expressly forbade them from doing so.
Moreover, as the circuit court noted, this Court and the United States Supreme Court have rejected claims alleging ineffective assistance of counsel regarding the failure to introduce mitigating evidence where the decision not to introduce that evidence was at the express direction of the accused. See, e.g., Adkins v. State, 930 So.2d 524, 539-40 (Ala. Crim. App. 2001) ("We join the majority of jurisdictions that have considered this issue and hold that a defendant is estopped from raising a claim of ineffective assistance of counsel for *109 counsel's failure to present mitigating evidence when the defendant waived the presentation of mitigating evidence. To punish Adkins's attorneys for following his wishes would conflict with the doctrine of invited error. 'Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.' Phillips v. State, 527 So.2d 154, 156 (Ala. 1988)."); see also Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).[10] Here, there was uncontradicted evidence that counsel's decision not to introduce evidence of the abuse was at the express direction of Acklin.
Acklin has not demonstrated that the circuit court's findings regarding this claim were erroneous, and he is due no relief.
B.
Acklin argues that his trial "counsel knowingly presented misleading testimony that was harmful to his client and helpful to the person paying him, which establishes that his divided loyalties adversely affected his representation." (Acklin's brief, p. 17.) In Acklin's rendering,
"[w]ithin [36] hours of Theodis's statement that he would not support the case if Rahmati presented evidence of abuse, Rahmati had Acklin sign a typed document stating that he did not want evidence of abuse presented. Although the waiver itself is problematic, it is not necessary for this Court to address the waiver. Even assuming that the waiver was valid, Rahmati did not simply omit evidence that Theodis had abused Acklin; instead, he presented evidence suggesting the opposite: that Theodis was a supportive father and Acklin had a positive upbringing.
"Rahmati knew Theodis would not be candid about the abuse, yet he affirmatively asked questions that would enable Theodis to mislead the jury and the court."
(Acklin's brief, pp. 18-19.)
At the outset, we reiterate our holdings in Part I.A.-first, Acklin failed to prove that Rahmati's loyalties were divided between Acklin and Theodis and, second, Rahmati's failure to introduce evidence of the abuse was at Acklin's express direction.
In denying this claim, the Rule 32 court did not directly address whether Theodis's testimony was misleading at the penalty phase or the sentencing hearing. The court noted:
"This Court has reviewed penalty phase testimony presented by Mr. Rahmati and Mr. Gray. Most of this testimony concerned Acklin's character and personality. Acklin specifically prevented his trial counsel from presenting evidence concerning his abuse as a child to the jury or the trial judge."
(C. 4030.) The circuit court then found that Acklin failed to prove that he was prejudiced by the testimony given during the penalty phase or by Theodis's statements at the sentencing hearing. The court also held that Acklin did not prove that the introduction of evidence of the alleged *110 abuse would have had any impact on the outcome of the penalty phase or the sentencing hearing. On appeal, Acklin has not demonstrated that those findings are erroneous.
As to Acklin's claim on appeal that Rahmati affirmatively elicited testimony from Theodis that Rahmati "knew" was "false," the record does not support that conclusion. At the penalty phase, Theodis's testimony consisted of seven pages. (Trial R. 964-70.) After asking Theodis to state his name for the record and whether Theodis was Acklin's father, Rahmati asked Theodis nine questions.[11] Acklin's characterization of those questions as "enabl[ing] Theodis to mislead the jury and the court" is inaccurate. Illustrative of Acklin's mischaracterization of those questions is his description of the question-"Q. Let me ask you this, did you ever see Nick to be disrespectful to anyone and if so, did you ever discipline him for anything?" Acklin suggests that Theodis's response to this question-i.e., "We didn't have that problem" and Acklin "was easily disciplined"-was false in light of the allegations of abuse. Acklin also asserts that Theodis's additional comments in response to that question-e.g., that Theodis was an "overly protective [parent], really a father who loves his children"-were false in light of the allegations of abuse.
Contrary to Acklin's assertions, Rahmati's question about discipline may fairly be seen as an attempt to elicit Theodis's assessment of Acklin's character-not as an affirmative attempt to get Theodis to mislead the court and the jury as to whether Theodis himself was a "good" parent. As to whether Rahmati had an obligation to inform the court as to parts of Theodis's testimony that he thought might be untrue, Acklin has not demonstrated either (1) that Rahmati thought the testimony was "untrue" or (2) that Rahmati had an obligation to inform the court of his thoughts about the veracity of that testimony.
As to what occurred at the sentencing hearing, we note that Acklin mischaracterizes Theodis's participation at that hearing. The statements made by Theodis at that hearing before the sentencing judge followed this statement from Rahmati: "This is not going to be testimony and I am not going to ask [Theodis] Acklin questions. As my client's father, he simply has something *111 that he would like to tell the Court." (Trial R. 1025.)
Acklin directs this Court to that part of the sentencing order, also quoted above, in which the sentencing court stated:
"The Court was impressed with the sincerity of the testimony by the defendant's mother and father. They are clearly good people and tried to do the right thing in raising him. However, the Court does not find this to be a mitigating circumstance. Most killers are typically the products of poverty, a dysfunctional family, physical or sexual abuse and/or social deprivation. Acklin was the product of a loving middle-class family. Acklin was exposed to all of the values that are central to an ordered society; however, he chose to reject them. Acklin made a conscious choice to become a killer; he was not born to it."
(Trial C. 294.) According to Acklin, Rahmati knew that the trial court's statements here were incorrect, and, Acklin says, Rahmati should have objected to them or at least brought the trial court's attention to them.
The Rule 32 court rejected this argument, however-finding, again, that the responsibility for Rahmati's failure to tell the sentencing court about the abuse is because Acklin had expressly prohibited Rahmati from doing so. The circuit court noted, again, that a "defendant cannot intentionally prevent his trial counsel from presenting evidence during trial and then, years later, attempt to profit from trial counsel's failure" to present that evidence. See Adkins v. State, 930 So.2d at 539-40 ; see also Gilreath v. Head, 234 F.3d 547, 550 n.10 (11th Cir. 2000) ("We readily conclude that trial counsel-by relying on Petitioner's instruction not to present mitigating mental health and alcohol abuse evidence-did not perform in an unreasonable manner."). We agree with the circuit court.
Acklin's refusal to permit Rahmati to introduce evidence of the abuse left trial counsel with the task of presenting a mitigation case without the ability to present evidence of the abuse. Trial counsel chose a strategy of presenting evidence of Acklin's pleasant disposition and his remorse over the murders. That strategy included attempting to portray Acklin and his family "in the best light [they] possibly could for both Judge Smith and for the jury." (R. 151.) Counsel presented testimony from eight witnesses, including Acklin's parents, his aunt, his grandmother, a retired police officer, an employee at a youth organization, and two reverends.
As noted above, we do not agree with Acklin's characterization of Rahmati's efforts during the penalty phase and the sentencing phase. Acklin has not shown that Rahmati intentionally elicited false evidence or failed to draw the court's attention to evidence Rahmati knew to be false.[12] Although Rahmati knew about the allegations of abuse, he had also been told by Velma that the alleged abuse was most intense during the year before Velma and *112 Theodis divorced-which occurred when Acklin was 11 (he was 24 at the time of the crimes). At the time of the trial, Theodis had remarried and had been a reverend for some time. There was testimony that Acklin had regularly attended church and had participated in the youth choir at his church. Theodis had paid some of Acklin's legal bills, and he made an impassioned plea for mercy to the jury and to the trial court.[13] Thus, even if Rahmati believed that the allegations about the abuse were accurate, Theodis's comments about loving his children and raising them in a "Christian" home were not necessarily untrue.
Nor do we agree with Acklin's suggestion that, if the jury or the trial court had known about the abuse-or at least had not heard some evidence that Acklin was raised in a "loving middle-class family"-the outcome might have been different. The sentencing court did not expressly rely on Acklin's home environment as a basis for imposing the death sentence-rather, the court rejected his home environment as a mitigating circumstance.[14]
After hearing much of the evidence that Acklin argues should have been introduced, the Rule 32 court found:
"While Acklin presented evidence his father was abusive to him, his mother and siblings, he completely failed to prove why his exposure to abuse would have been considered a mitigating factor by the jury and the trial court. This is especially true given Acklin's age at the time of the offenses. The abuse Acklin endured at the hands of his father clearly had no effect on Acklin's ability to work, maintain relationships, or to function in society to conform his behavior to the requirements of the law if he chose to do so. See Mills v. Singletary, 63 F.3d 999, 1025 (11th Cir. 1995) ('[E]vidence of Mills' childhood environment likely would have carried little weight in the light of the fact that Mills was twenty-six when he committed the crime.'); see also Tompkins v. Moore, 193 F.3d 1327, 1337 (11th Cir. 1999) (holding that 'where there are significant aggravating circumstances and the petitioner was not young at the time of the capital offense, "evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight" ')(citation omitted)."
(C. 4032.)
In sum, Acklin has not demonstrated any reasonable probability that evidence of the alleged abuse would have altered the trial court's weighing of the aggravating and mitigating circumstances, particularly in light of the "savage brutality of these murders" and the sentencing court's determination "that each of the two aggravating circumstances, even standing alone, outweigh all the mitigating circumstances." (Trial C. 295.) Cf. Kansas v. Carr, 577 U.S. ----, 136 S.Ct. 633, 646, 193 L.Ed.2d 535 (2016) (stating, in rejecting a claim that certain acts or evidence had rendered a sentencing proceeding fundamentally unfair: "None of that mattered. What these *113 defendants did-acts of almost inconceivable cruelty and depravity-was described in excruciating detail [by one of the victims who had survived]."). Acklin also has not demonstrated that his trial counsel knowingly presented false testimony due to a conflict of interest.
The circuit court properly denied this claim, and Acklin is due no relief.
C.
Acklin next challenges the validity of the statement he signed instructing his counsel not to introduce evidence of the alleged abuse he suffered as a child. He argues that "to the extent that the Court addresses the waiver, it should hold that Rahmati's decision to obtain the waiver without informing Acklin or the court of his divided loyalties constitutes another adverse effect of the conflict."[15] (Acklin's brief, p. 24.)
In Part I.A. of this opinion we held that Acklin failed to show that Rahmati's loyalties were divided or that an actual conflict of interest existed.[16] Furthermore, Rahmati testified that Acklin knew about and consented to the third-party payer arrangement, whereby Velma and Theodis were paying his legal fees. Additionally, we held that there was no evidence that Rahmati's independent judgment was affected by this arrangement.
In addressing this claim, the circuit court first cited Adkins, supra, for the proposition that a defendant who decides to waive mitigation evidence is estopped from challenging his counsel's effectiveness based on a failure to present mitigating evidence. The circuit court then found:
"Acklin did not testify at the evidentiary hearing. Therefore, there is no evidence before this Court demonstrating that he did not knowingly and voluntarily waive having his trial counsel present evidence concerning his father's abuse toward him and members of his family to the jury during the penalty phase. This Court is well satisfied that Mr. Rahmati and Mr. Gray were prepared to present such evidence on Acklin's behalf during the penalty phase of trial."
(C. 4012 (emphasis added).) The circuit court's findings are supported by the record, which indicated that Acklin voluntarily signed a statement acknowledging that he had prohibited his attorneys from introducing evidence of the alleged abuse. Acklin is due no relief on this claim.[17]
II.
Acklin argues that he "was denied the effective assistance of counsel at the penalty phase of his capital trial." (Acklin's brief, p. 26.) He alleges three ways in which counsel was allegedly ineffective.
*114 A.
In Part II.A. of his brief, Acklin merely reiterates his arguments that his counsel presented misleading evidence at the penalty phase regarding Acklin's childhood. The circuit court rejected these arguments, as we did in Part I.B. of this opinion. Acklin is due no relief on this claim.
B.
Acklin argues next that his trial "counsel conducted an inadequate investigation such that Acklin could not possibly make a knowing and intelligent waiver of the abuse evidence." (Acklin's brief, p. 29.) Acklin cites decisions such as Whitehead v. State, 955 So.2d 448, 460 (Ala. Crim. App. 2006) (" '[I]f counsel failed to investigate and advise, then Petitioner's waiver was not knowing and intelligent and thus without legal effect.' Holloway [v. Horn], 161 F.Supp.2d [452,] 569 [ (E.D. Pa. 2001) ] (emphasis added), rev'd on other grounds, 355 F.3d 707 (3d Cir. 2004)."), and Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
Those decisions are not controlling on the question presented here. Whitehead involved a petitioner who had allegedly waived the right to present any mitigation evidence. 955 So.2d at 454. Further, the record in Whitehead did not disclose that counsel had performed any investigation for the penalty phase. Under the circumstances there, this Court appears to have held that a purported waiver of the right to present any mitigation evidence would not automatically foreclose a subsequent challenge to the adequacy of counsel's investigation and preparation for the penalty and sentencing phases of a capital-murder trial.
In the instant case, Acklin did not waive a mitigation presentation; rather, he prohibited his attorneys from introducing evidence during their mitigation presentation of alleged abuse. Further, as recounted above in Part I, counsel in fact prepared for the penalty phase. Thus, Whitehead is inapposite.
Additionally, Whitehead was based extensively on the United States Supreme Court's decisions in Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), and Wiggins, supra. Rompilla and Wiggins addressed claims of ineffective assistance of counsel related to the adequacy of counsel's penalty-phase investigation. Our 2006 Whitehead decision quoted extensively from Rompilla but failed to apply the decision in a significant manner. We did say, however, that "an examination of the investigation counsel conducted is critical to determining the validity of the waiver and the effectiveness of counsel's performance in relation thereto." 955 So.2d at 470.
Subsequent to Whitehead, the United States Supreme Court in Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), clarified that it has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." 550 U.S. at 479, 127 S.Ct. 1933. Thus, Acklin has not demonstrated that he is entitled to relief on his claim that he was not knowing and informed when he signed the statement prohibiting his attorneys from introducing evidence of the alleged abuse.
To the extent Acklin challenges the adequacy of counsel's investigation, Acklin failed to show that the investigation was unreasonable under the circumstances. As outlined above in Part I, counsel spent considerable time on the case and planned for the penalty phase by getting the names of character witnesses from family members, interviewing several witnesses, and consulting expert witnesses.
*115 Moreover, trial counsel specifically inquired about whether there had been any abuse in the family, but Acklin and his family members did not disclose the alleged abuse until two days before his trial. Again, once counsel found out about the alleged abuse, counsel confronted Theodis and then consulted extensively with Acklin, who expressly prohibited them from introducing any evidence of the alleged abuse.
Acklin is due no relief on this claim.
C.
Acklin argues that his trial counsel were ineffective for failing "to inform the court that the jail was medicating Acklin with Xanax, which affected his demeanor at trial."[18] (Acklin's brief, p. 34.) Acklin asserts:
"Three days before trial, the Madison County Jail began giving Nicholas Acklin Xanax, an anti-anxiety drug with sedative effects. As pharmacologist Dr. Pamela Sims explained at the Rule 32 hearing, Xanax is used primarily to treat anxiety and cause sedation: 'The purpose of Xanax is to remove emotion from [the patient].' R. 555. Acklin was receiving a 'significant dose' of the drug, R. 549, such that it would be expected to have sedative effects, moving a person toward sleep even if he were in a highly emotional situation.
"....
"Although Rahmati knew that the jail had begun giving Acklin a new drug shortly before trial 'to help him calm down,' R. 145, he did not take any steps to inquire about the drug or its effects. Accordingly, Rahmati did not request a jury instruction on the ways in which the drug might affect Acklin's demeanor. He also did not inform the court about the drug, even when the court specifically relied on Acklin's lack of remorse-displayed by his 'gaze that was devoid of emotion,' [Trial C. 294]-as a reason for imposing the death penalty."
(Acklin's brief, pp. 34-35.)
The circuit court rejected this claim. It found:
"Mr. Rahmati also testified at the evidentiary hearing that he was aware that Acklin was given additional medication at the Madison County Jail during his trial, but Mr. Rahmati could not recall specifically what Acklin was given. At the time of Acklin's trial Mr. Rahmati and Mr Gray had represented him for more than two years. During Acklin's trial, neither Mr. Rahmati nor Mr. Gray noticed his affect or demeanor was any different than at any other time during their representation. Mr. Rahmati also testified that Acklin's demeanor at the Rule 32 evidentiary hearing was the same as it was during his capital murder trial years before.
"This Court notes that there is nothing in the trial record, and Acklin presented no evidence at the evidentiary hearing, indicating that Acklin ever complained to Mr. Rahmati or Mr. Gray that the medication he was prescribed during his trial affected his ability to assist[ ] in his defense. Furthermore, in observing Acklin during the course of the evidentiary hearing, the Court notes that Acklin displayed a flat and subdued demeanor, which appeared to be consistent within his demeanor at trial based upon descriptions of same in the record. Acklin also presented no evidence proving that anyone that observed him during his trial informed Mr. Rahmati or Mr. Gray that Acklin's appearance or demeanor was anything other than normal. Acklin also failed to present any evidence *116 establishing that he objected to being administered Xanax during his trial or that he or anyone reported to Mr. Rahmati, Mr. Gray, or to any jail personnel that he was experiencing side effects from the drug."
(C. 4001-02.) The findings of the circuit court are supported by the record, and Acklin has not demonstrated that he is entitled to relief on this claim.
D.
Acklin next argues that his "counsel's deficient performance prejudiced" him. (Acklin's brief, p. 37.) Acklin again cites (1) the sentencing court's alleged "misunderstanding of the facts" regarding Acklin's childhood and (2) the sentencing order's statements about Acklin's "demeanor."
We have already held that counsel did not perform deficiently as to either of those aspects of the sentencing court's order. Acklin expressly prohibited his counsel from introducing evidence of the alleged abuse in his childhood, and counsel did not mislead the court or have an obligation to ignore Acklin's instructions and tell the court about the allegations of abuse. Further, counsel's failure to notify the court or the jury about Acklin's taking Xanax during the trial was not deficient performance. Accordingly, a discussion of whether counsel's representation prejudiced Acklin is unnecessary.
Regardless, Acklin has not demonstrated that counsel's allegedly deficient performance prejudiced him. First, Acklin's statement that "the two main factors the trial court weighed against Acklin were his positive upbringing and his unemotional demeanor in court" is incorrect. The sentencing order is clear that the two main factors the court weighed against Acklin were the two aggravating circumstances-which, the sentencing court said, would have each independently outweighed the mitigating circumstances. Furthermore, as the State notes in its brief, the sentencing court made clear that "[t]he vicious ruthlessness of the murders was more than sufficient" to justify the sentence of death. (State's brief, p. 59.)
As to the alleged prejudice suffered by not introducing evidence of Acklin's abuse as a child, Acklin's reliance on cases such as Wiggins, supra, State v. Gamble, 63 So.3d 707 (Ala. Crim. App. 2010), and Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008), is misplaced. Unlike counsel in those cases, Acklin's counsel learned about the alleged abuse and was willing to introduce evidence of it. Also, unlike the defendants in those cases, Acklin expressly prohibited his counsel from introducing the evidence.
Finally, to the extent Acklin argues that this Court should analyze his ineffective-assistance claims cumulatively, we have repeatedly declined similar requests from petitioners to do so. See, e.g., Mashburn v. State, 148 So.3d 1094, 1118 (Ala. Crim. App. 2013) ; Washington, 95 So.3d at 58. Furthermore, because Acklin has failed to demonstrate any deficient performance, there is no opportunity for this Court to engage in a cumulative-effect analysis.
Acklin is due no relief on this claim.
III.
Acklin argues that "the circuit court erred in excluding the testimony of ethics expert Norman Lefstein, which would have aided the court in its consideration of defense counsel's representation." (Acklin's brief, p. 41.) According to Acklin,
"Lefstein is a leading expert in the field of legal ethics in criminal law and would have been well positioned to assist the court.
"... Acklin ... proferred an affidavit in which Lefstein analyzed the ethical issues in the case and determined that *117 (1) Rahmati faced an actual conflict of interest, and (2) his actions in the face of the conflict fell below professional norms."
(Acklin's brief, p. 41.)
In deciding to exclude this testimony, the circuit court relied on our decision in McWilliams v. State, 897 So.2d 437 (Ala. Crim. App. 2004), overruled in part on other grounds by Ex parte Jenkins, 972 So.2d 159 (Ala. 2005), in which this Court addressed a circuit court's decision to exclude testimony from an attorney who was called as an expert witness to offer opinions about what constituted ineffective assistance of counsel. In evaluating this issue, we stated:
"[T]he appellant argues that the circuit court erred in striking attorney Kevin McNally's testimony. McNally was called as an expert to testify about what constituted ineffective performance of counsel. When it excluded his testimony, the circuit court stated:
" 'The Court, as the trier of fact in these proceedings, plainly does not need the assistance of McWilliams's expert to "understand the evidence" or "determine a fact in issue." In fact, the Court is in a much better position than Mr. McNally to evaluate the legal issues presented by McWilliams's petition for relief. In addition to service on the bench, the Court has the benefit of the experience of having practiced law in Alabama for many years and was practicing law before, and at the time of, this trial....
" 'Mr. McNally, on the other hand, is not a licensed attorney in Alabama and has never even represented a client in this State.... During voir dire, McNally repeatedly demonstrated his ignorance of Alabama law, but was offered as an expert both as to national and Alabama standards of practice.'
"(C.R. 1764.) We do not find that there was any error in the circuit court's ruling striking McNally's testimony. As the Supreme Court of New Mexico stated in Lytle v. Jordan, 130 N.M. 198, 211-12, 22 P.3d 666, 679-80 (2001) :
" 'The issues of whether defense counsel performed below the level of a reasonably competent attorney and whether deficient performance affected the result of the trial "are mixed questions of law and fact," Strickland, 466 U.S. at 698, 104 S.Ct. 2052, which "require[ ] the application of legal principles to the historical facts of this case." Cuyler v. Sullivan, 446 U.S. 335, 342, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The district court's determination of these questions represents "a conclusion of law rather than a finding of fact." Id. at 341, 100 S.Ct. 1708....
" '... We believe it is superfluous for expert witnesses to advise a court, whether it is the district court or an appellate court, about the proper application of existing law to the established historical facts and about the ultimate issue of trial counsel's effectiveness. See Provenzano v. Singletary, 148 F.3d 1327, 1331-32 (11th Cir. 1998) ; Parkus v. State, 781 S.W.2d 545, 548 (Mo. 1989) (en banc); State v. Thomas, 236 Neb. 553, 462 N.W.2d 862, 867 (1990) ; State v. Moore, 273 N.J. Super. 118, 641 A.2d 268, 272 (1994) ; Commonwealth v. Neal, 421 Pa. Super. 478, 618 A.2d 438, 439 n.4 (1992).' "
897 So.2d at 456.
Acklin attempts to distinguish McWilliams by arguing that his "claim involves a conflict of interest resulting from a third-party *118 payer agreement." (Acklin's brief, p. 42.) This argument is unavailing.
The claim for which Acklin sought to use Lefstein as an expert witness is a claim of ineffective assistance of counsel based on an alleged conflict of interest. Lefstein's testimony would have been an attempt to advise the circuit court about the proper application of the law to the facts and about the proper outcome of the case; in essence, Lefstein's testimony would have provided the circuit court with Lefstein's own legal conclusions.
The circuit court did not abuse its discretion in excluding Lefstein's testimony.
IV.
Acklin's final claim is that he was denied the effective assistance of counsel on direct appeal.[19] This claim includes two allegations.
A.
First, Acklin argues that appellate counsel should have argued on appeal that the jury instructions at the close of the penalty phase were erroneous. Specifically, he asserts that the jury was instructed "that it should recommend life if 'the mitigating circumstances outweigh any aggravating circumstances that exist.' " (Acklin's brief, pp. 44-45 (quoting Trial R. 1013).) Acklin argues: "As such, the trial court failed to make clear that the jury should vote for life if the aggravating and mitigating circumstances were in equipoise." (Acklin's brief, p. 45.) Acklin cites decisions such as Ex parte Bryant, 951 So.2d 724 (Ala. 2002). Because Acklin's trial counsel did not object, this Court, had appellate counsel challenged the instructions, would have reviewed them for plain error only.
The jury instructions Acklin finds objectionable, however, are very similar to the instructions challenged in Ex parte Mills, 62 So.3d 574, 599 (Ala. 2010). Those instructions stated, in relevant part, that the jury should recommend life imprisonment without the possibility of parole if it determined that "the defendant has overcome with the mitigating circumstances, that they outweigh the aggravating circumstances." In rejecting Mills's challenge to those instructions, the Alabama Supreme Court specifically distinguished Mills's case from Ex parte Bryant, noting:
"Mills ... argues that this instruction constitutes plain error under Ex parte Bryant, 951 So.2d 724 (Ala. 2002). The State, citing Ex parte McNabb, 887 So.2d 998 (Ala. 2004), and Ex parte Walker, 972 So.2d 737 (Ala. 2007), argues that Bryant is distinguishable and that no plain error occurred. We agree with the State.
"In Bryant, the trial court's instructions to the jury suggested that the jury could recommend the death sentence if the mitigating circumstances did not outweigh the aggravating circumstances. In other words, the instructions suggested that the jury could recommend the death sentence if the aggravating circumstances and the mitigating circumstances were of equal weight. 951 So.2d at 730. Even more significant to the plain-error analysis in Bryant, however, was that the trial court's instructions invited the jury to recommend a sentence of death without finding the existence of any aggravating circumstance. 951 So.2d at 730.
"In McNabb, the sentencing instructions included the following:
" 'Now, ladies and gentlemen, if, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable *119 doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstances, then your verdict would be: "We, the jury, recommend that the defendant be punished by death, and the vote is as follows...." However, if after a full and fair consideration of all of the evidence in the case, you determine that the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole ....'
" 887 So.2d at 1001 (emphasis added in McNabb ). This Court in McNabb concluded that these instructions did not constitute plain error because the trial court had not taken the additional step of inviting the jury to recommend a death sentence without finding the existence of any aggravating circumstance. Specifically, this Court stated in McNabb:
" 'The charge in this case was not infected with the peculiar error present in [ Ex parte] Bryant [, 951 So.2d 724 (Ala. 2002) ], that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error "seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings," Ex parte Davis, 718 So.2d [1166,] at 1173-74 [ (Ala. 1998) ], so as to require a reversal of the sentence.'
" 887 So.2d at 1004.
"Similarly, in Walker, which involved instructions regarding the balancing of the aggravating circumstances and the mitigating circumstances that were identical to the instructions in McNabb, this Court held that no plain error occurred in the sentencing instructions because 'the trial court did not invite the jury in Walker's case to recommend a sentence of death without finding any aggravating circumstance.' 972 So.2d at 743.
"In Mills's case, the trial court's instructions, taken as a whole, clearly informed the jury that the only way it could recommend a sentence of death was if the jury determined that aggravating circumstances existed and that those aggravating circumstances outweighed the mitigating circumstances. The trial court instructed the jury initially that 'the law also provides that the punishment which should be imposed upon the defendant depends on whether any aggravating circumstances exist beyond a reasonable doubt, and if so, whether the aggravating circumstances outweigh any mitigating circumstances.' (Emphasis added.) Even in the above-quoted portion of the instructions on which Mills relies for his argument, the trial court stated:
" '[I]f after a full and fair consideration of all the evidence in this case and all reasonable inferences therefrom you are convinced that the aggravating circumstances ... which you determine the State of Alabama has proved to you beyond a reasonable doubt in today's proceeding, if *120 those outweigh the mitigating circumstances which have been presented by the defense, your verdict would be, "We, the jury, recommend the defendant Jamie Mills be sentenced to death." '
"(Emphasis added.) Accordingly, we hold that there was no plain error in the trial court's instructions regarding the weighing of the aggravating circumstances and the mitigating circumstances."
Mills, 62 So.3d at 599-601.
In Acklin's case, the instructions were virtually identical to those instructions that were upheld in Ex parte Mills, supra, and Ex parte McNabb, 887 So.2d 998 (Ala. 2004). Thus, any challenge to those instructions by Acklin's appellate counsel would have been without merit. See Bearden v. State, 825 So.2d 868, 872 (Ala. Crim. App. 2001) (holding that "Bearden's counsel could not be ineffective for failing to raise a baseless objection"). Accordingly, Acklin is due no relief on this claim.
B.
Acklin also argues that his appellate counsel should have challenged comments by the prosecution during its closing arguments. These comments, had they been challenged on appeal, would have been reviewed for plain error only.
Acklin describes the first comment as follows:
"At the conclusion of his rebuttal argument at the penalty phase, the prosecutor described at length the military funeral of one of the victims and his own military service. For example, he provided his service history and said that this gave him a sense of 'kinship' with one of the victims, and he described his emotions upon hearing the bugle play Taps at the victim's funeral."
(Acklin's brief, p. 46.)
In Thompson v. State, 153 So.3d 84, 159 (Ala. Crim. App. 2012), this Court stated:
" 'A prosecutor is entitled to argue forcefully .... "[E]nthusiatic rhetoric, strong advocacy, and excusable hyperbole" are not grounds for reversal .... The jury are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides.'
" Commonwealth v. Wilson, 427 Mass. 336, 350, 693 N.E.2d 158, 171 (1998). Cf. Gonzalez v. State, 115 S.W.3d 278 (Tex. Ct. App. 2003) (prosecutor's comparison of the defendant to terrorist Osama bin Laden was improper).
" ' "[S]tatements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and not expected to become factors in the formation of the verdict." ' Duren v. State, 590 So.2d 360, 364 (Ala. Crim. App. 1990) (quoting Bankhead v. State, 585 So.2d 97, 106 (Ala. Crim. App. 1989) )."
When viewed in the context of the entire closing argument and in light of all the evidence presented at the trial, the prosecutor's brief reference to his military service and his comment about the military funeral of one of the victims did not undermine the reliability of the jury's verdict, and Acklin has not demonstrated that the comments were plainly erroneous. Accordingly, appellate counsel was not ineffective for failing to challenge those comments on appeal. Bearden, supra.
Acklin also argues that the prosecution "made an improper reference to the media's characterization of the offense, telling the jury that the crime 'has been *121 described as the cell phone murders.' " (Acklin's brief, pp. 46-47.) When placed in context, it appears, as the circuit court found, that the prosecutor was arguing that the murders were, in fact, not committed because of a cellular telephone but because Acklin chose to kill senselessly and viciously. When viewed in the context of the entire closing argument and in light of all the evidence presented at the trial, the prosecutor's brief reference to "the cell phone murders" did not undermine the reliability of the jury's verdict, and Acklin has not demonstrated that the comment was plainly erroneous. Accordingly, appellate counsel was not ineffective for failing to challenge the comment on appeal. Bearden, supra.
Finally, Acklin asserts:
"[T]he prosecutor made an inflammatory comment comparing Acklin's case to the O.J. Simpson case during [the] guilt-phase closing argument. While defining capital murder for the jury, he stated: 'O.J. Simpson ... was charged with capital murder because two people were killed.' The circuit court minimized this remark as a simple comparison. But it was far more than this; by comparing Acklin, a black defendant charged with killing several white victims, to O.J. Simpson, the prosecutor improperly fanned potential biases."
(Acklin's brief, p. 49.) In addressing this claim, the circuit court stated:
"[T]his Court finds that a plain reading of the prosecutor's comment proves he was not comparing Acklin to O.J. Simpson as a person. This Court is convinced that the prosecutor was simply using an example to explain to the jurors the elements of the capital murder charge levied against Acklin. This Court concludes that when the prosecutor's comment is read in its proper context, there is no reasonable probability that this comment prejudiced Acklin and denied him a fair trial."
(C. 4020-21.) We agree with this finding. Acklin is due no relief on this claim. Bearden, supra.
Conclusion
The judgment of the circuit court is affirmed.
AFFIRMED.
Welch, Kellum, and Burke, JJ., concur. Windom, P.J., recuses herself.

"Trial C." refers to the clerk's record in Acklin's direct appeal; "Trial R." refers to the reporter's transcript in the direct appeal. See Rule 28(g), Ala. R. App. P. See also Hull v. State, 607 So.2d 369, 371 n.1 (Ala. Crim. App. 1992) (the Court of Criminal Appeals may take judicial notice of its own records).

Joseph Wilson, Acklin's codefendant, was tried in August 1998. Following a guilty verdict and a unanimous jury recommendation of death, Wilson was sentenced to death. See Wilson v. State, 777 So.2d 856 (Ala. Crim. App. 1999).

Circuit Judge James P. Smith, who had presided over Acklin's trial, was originally assigned the petition. Judge Smith recused himself on November 4, 2002, and the matter was reassigned to Circuit Judge Loyd H. Little. Judge Little recused himself on October 21, 2008. After a number of additional reassignments and recusals, the matter was ultimately assigned to Circuit Judge Chris Comer on May 15, 2013. On December 9-12, 2013, Judge Comer held an evidentiary hearing on the remaining claims.

Acklin's petition presented claims related to both the guilt phase and penalty phase of his trial. At oral argument in this matter, however, counsel for Acklin stated that Acklin is not seeking a new guilt-phase proceeding; rather, Acklin is seeking a new penalty-phase proceeding only.

Rahmati and Gray testified at the Rule 32 evidentiary hearing.

Rahmati testified that his law firm routinely sent out billing statements or letters in the middle of each month. Acklin introduced several of those letters into evidence.

When questioned about this, Velma testified that "when the divorce papers come to the home, I remember I signed them, and that's all I know. I didn't read them at the time." (R. 268.) When asked about whether she was ever "concerned for [her sons'] safety," Velma testified:
"I didn't feel that [Theodis] would hurt them, you know; I didn't feel like he would really actually hurt them. But I knew that his discipline, or how he would handle it, affected them. But I never thought that he would actually hurt them."
(R. 268-69.)

Rahmati described the potential benefit of the evidence in the following manner: "I think any human being that listens to kids growing up in that environment could feel like maybe they turned out the way they did because of that, and so they could possibly find some sympathy." (R. 117.)

Acklin cites Rule 1.8(f), Ala. R. Prof'l Conduct, which states: "A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client consents after consultation" and "(2) there is no interference with the lawyer's independence of professional judgment." The evidence in this case, however, supports a finding that trial counsel did not violate Rule 1.8(f).

Both Adkins and Schriro involved a defendant's waiver of all mitigation evidence, and in both cases the trial court engaged the defendant in a colloquy regarding the decision to waive all mitigation evidence. Neither circumstance is present here: Acklin did present some evidence in mitigation, and the circuit court therefore did not have an opportunity to engage Acklin in a colloquy regarding the decision not to offer all mitigating evidence that was potentially available.
Acklin raises issues pertaining to the sufficiency of the statement he signed and whether his trial counsel had a duty to inform the circuit court about it. We address those issues later in this opinion.

Those questions were:
1. "Q. Tell me what this incident has brought to your family, [Acklin's] being involved in this case?" (Trial R. 964.)
2. "Q. Let me ask you this, sir, when you say you were traumatized, did you notice [Acklin] at any time in his life just drifting away to something like this or was this his character? What happened?" (Trial R. 965.)
3. "Q. Let me ask you this, the fact he was alone and quiet, did you notice him to be persuaded-or let me ask you this, did he have the qualities of a follower or qualities of a leader?" (Trial R. 966.)
4. "Q. When-you know it is hard to ask you questions in times like this. What is it that you-is there anything that you want to say to the families of the victims at this time?" (Trial R. 966.)
5. "Q. Let me ask you this, sir, did [Acklin] ever express to you anything that may have tipped you off about what was going on in his life that that caused him to be where he was on that night?" (Trial R. 967.)
6. "Q. How long had he been away from church?" (Trial R. 968.)
7. "Q. Let me ask you this, did you ever see Nick to be disrespectful to anyone and if so, did you ever discipline him for anything?" (Trial R. 968-69.)
8. "Q. How often do you see [Acklin] now?" (Trial R. 969.)
9. "Q. Is there anything that you would like to ask this jury at this time?" (Trial R. 969.)

Acklin cites two cases in support of the proposition that a lawyer may not permit testimony that he knows is false or misleading: Nix v. Whiteside, 475 U.S. 157, 171, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), and McCombs v. State, 3 So.3d 950, 953 (Ala. Crim. App. 2008). Those cases, however, are not applicable here.
First, as we have noted, Rahmati did not permit testimony that he "knew" to be false or misleading. Second, those cases involved scenarios in which the lawyer's "knowledge" about the falsity of the evidence was clear. In Nix, the defendant told his lawyer that he would testify to something that the lawyer knew was a lie. Nix, 475 U.S. at 160-62. In McCombs, the lawyer told his client to lie. McCombs, 3 So.3d at 952. Neither of those situations is present here.

Theodis testified at the penalty phase:
"I pray that you will have mercy. That you will understand. That you will empathize with me as a parent and I feel like maybe I am given more favor than the parents of the victims. They didn't have a chance to plead for their children's lives, but I seize this opportunity to ask you to have mercy. As Rev. Rogers said, there are no winners. We have all lost."
(Trial R. 970.)

Had the evidence been as Acklin now argues it should have been-that his home environment had been bad and that he endured horrific abuse at the hands of his father-this Court has often noted that whether such evidence is mitigating "may be in the eye of the beholder." Davis v. State, 44 So.3d 1118, 1141 (Ala. Crim. App. 2009).

Acklin's argument in this regard is made as an alternative one. Specifically, he argues:
"Although it is not necessary for this Court to address the purported waiver of mitigation since Acklin is entitled to relief even if the waiver was valid, the waiver itself was a product of counsel's conflict. Because Rahmati presented misleading testimony that harmed his client and helped the person paying him, it is not necessary for this Court to address whether Acklin made a valid waiver of his right to present evidence that he was abused as a child."
(Acklin's brief, p. 24.)

Acklin cites several authorities regarding disclosure of a conflict to the court. Because no conflict existed, however, those authorities are inapposite.

In Part II.B. of his brief, Acklin challenges the adequacy of his trial counsel's investigation. Among other things, he asserts in that part of his brief that the statement he signed (prohibiting evidence of the alleged abuse) was invalid because of counsel's allegedly inadequate investigation. We address Acklin's claim regarding the adequacy of the investigation in Part II.B. of this opinion.

Acklin has abandoned any claim that he was involuntarily administered Xanax.

Robert Tuten and John Butler represented Acklin on direct appeal.